J-A33035-14

2015 PA Super 21

| | |
|---|---|
| NIAJAH DEEDS, A MINOR BY HER LEGAL GUARDIAN, JULIA RENZULLI | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER, HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA AND TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA | |
| Appellees | No. 755 EDA 2014 |

Appeal from the Order of January 28, 2014
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 2558 May Term, 2011

BEFORE:  LAZARUS, J., WECHT, J., and STRASSBURGER, J.[*]

OPINION BY WECHT, J.:                          **FILED JANUARY 30, 2015**

In this medical negligence action, Niajah Deeds, a minor by her legal guardian, Julia Renzulli, appeals from the jury verdict in favor of the University of Pennsylvania Medical Center, Hospital of the University of Pennsylvania ("HUP"), and Trustees of the University of Pennsylvania ("Trustees") (collectively, "Appellees").  Following due review, we reverse and remand for a new trial.

The trial court set forth the following facts:[1]

_____

[*]     Retired Senior Judge assigned to the Superior Court.

On November 27, 2000, [Deeds'] mother, Tamika Peterson,[2] presented to HUP with back and abdominal pain. She was diagnosed with "common discomfort of pregnancy" and given preterm labor instruction sheets. She again presented on January [18], 2001 with complaints of headache, uterine contractions, and blurred vision. She reported cocaine and cigarette use. Ms. Peterson's records also indicated a physically small placenta and history of sickle cell disease, and physical trauma. Ms. Peterson was evaluated and instructed to return for a follow up visit on January 20, 2001. She was also given an instruction sheet for warning signs of preeclampsia.

Ms. Peterson did not return to HUP until 6:20 p.m. on January 20, 2001 with complaints of vaginal bleeding. Ms. Peterson suffered a placental abruption and gave birth via an emergency cesarean section. [Deeds] was born with severe birth defects.

Trial Court Opinion ("T.C.O."), 5/21/2014, at 2. Renzulli, Deeds' legal guardian, filed suit on Deeds' behalf on May 23, 2013, alleging that Appellees negligently failed to diagnose Peterson with preeclampsia when she was seen on January 18, 2001. The matter proceeded to a jury trial on October 25, 2013. At the end of the first day of trial, Deeds informed the court that the parties had stipulated that "all the people who provided medical treatment to Ms. Peterson were agents of Defendant HUP [and] asked the [c]ourt to dismiss the other defendants from the case." *Id.* The

_(Footnote Continued)_ _____

1      The Honorable Gary F. DeVito retired after presiding over the jury trial. The Honorable Mark I. Bernstein was assigned to write the opinion of the trial court.

2      Ms. Peterson is not a party to this case. In 2008, Deeds was removed from Ms. Peterson's home and placed in the foster care system. In October of 2008, Julia Renzulli became Deeds' foster parent, and Deeds' legal guardian in late 2009.

court denied the motion to dismiss the other defendants, thus permitting both HUP and the Trustees to be represented separately by individual counsel, each of whom then presented separate arguments and conducted separate examinations of witnesses throughout trial. Only HUP, and not the Trustees, appeared on the verdict sheet.

On November 12, 2013, the jury returned a verdict in favor of Appellees. Deeds timely filed post-trial motions requesting judgment notwithstanding the verdict or, alternatively, a new trial. The court denied the post-trial motions on January 28, 2014, and Deeds timely appealed. In response to the trial court's order, Deeds filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b) on March 31, 2014, and the trial court entered its Pa.R.A.P. 1925(a) opinion on May 21, 2014.

Deeds presents three questions for our review:

1.     In accordance with this Court's recognition of a *per se* rule entitling the plaintiff to a new trial following a defense verdict where counsel for defendant has improperly informed the jury that the plaintiff's injuries are being adequately cared for due to the availability of government benefits, should not [Deeds] receive a new trial here because [Appellees'] counsel committed this very transgression, to the likely prejudice of [Deeds]?

2.     Did the trial court err or otherwise abuse its discretion in not granting [Deeds] a new trial because the trial court improperly allowed two separate attorneys representing two separate defendants to question witnesses and present closing arguments even after the parties stipulated that this case would proceed only against a single defendant?

3.     Did the trial court err or otherwise abuse its discretion in permitting defendant Dr. Samuel Parry to testify as an expert witness beyond the scope of his actual treatment of the birth mother, even though defense counsel failed in violation of

applicable procedures to identify him as an expert witness and disclose his expert opinions during discovery?

Deeds' Brief at 5-6.

In her first issue, Deeds argues that she is entitled to a new trial because the trial court violated the collateral source rule when it "improperly allowed [Appellees] to inform the jury that [Deeds'] substantial medical needs were all being attended to at little to no cost to [Deeds'] legal guardian due to the existence of state and federal education and medical benefits programs." *Id.* at 16-17. We agree.

> Our standard of review regarding a trial court's denial of a motion for a new trial is limited. The power to grant a new trial lies inherently with the trial court and we will not reverse its decision absent a clear abuse of discretion or an error of law which controls the outcome of the case.

*Maya v. Johnson & Johnson & McNeil-PPC, Inc. (In re McNeill-PPC, Inc.)*, 97 A.3d 1203, 1224 (Pa. Super. 2014) (citation omitted).

> Generally, "the collateral source rule provides that payments from a collateral source shall not diminish the damages otherwise recoverable from the wrongdoer." *Johnson v. Beane*, 664 A.2d 96, 100 (Pa. 1995). This rule "was intended to avoid precluding a claimant from obtaining redress for his or her injury merely because coverage for the injury was provided by some collateral source, *e.g.* insurance." *Beechwoods Flying Service, Inc. v. Al Hamilton Contracting Corp.*, 476 A.2d 350, 352 (Pa. 1984); *see also id.* at 353 (the rule is "intended to prevent a wrongdoer from taking advantage of the fortuitous existence of a collateral remedy"); *Denardo v. Carneval*, 444 A.2d 135, 140 (Pa. Super. 1982) ("Pennsylvania law is clear; the victim of a tort is entitled to the damages caused by the tortfeasor's negligence regardless of compensation the victim receives from other

> sources"), citing, *inter alia*, **Boudwin v. Yellow Cab Co.**, 188 A.2d 259 (Pa. 1963).
>
> **Griesser v. National R.R. Passenger Corp.**, 761 A.2d 606, 609 (Pa. Super. 2000).
>
> Further, "when improperly admitted testimony may have affected a verdict, the only correct remedy is the grant of a new trial." **Id.** at 608 (citing **Collins v. Cooper**, 746 A.2d 615, 620 (Pa. Super. 2000)).

**Nigra v. Walsh**, 797 A.2d 353, 356 (Pa. Super. 2002) (citations modified).

In the instant case, Deeds identifies, and the record confirms, several instances in which Appellees elicited evidence of government benefits and collateral sources of compensation to Deeds. At trial on October 31, 2013, while cross-examining Deeds' expert witness (certified life care planner[3] Kathleen Corrigan, RN, CEN, CLCP), counsel for the Trustees elicited the following:

> [Counsel for the Trustees]: . . . It's not your opinion that Miss Renzulli is paying that out-of-pocket cost [for Deeds' medications]? You don't have that opinion, do you?
>
> [Corrigan]: That she is paying for the medication?
>
> [Counsel for the Trustees]: That they're being charged the out-of-pocket cost?
>
> [Corrigan]: I believe Medicaid is paying for the medication.

---

[3] A certified life care planner reviews medical records and bills to formulate an expert opinion projecting the future medical costs of an individual over her lifetime. In the instant case, the parties also stipulated that the "necessary and reasonable medical expenses for Naijah Deeds' past medical treatment is $2,227,312.66." Notes of Testimony ("N.T."), 10/31/2013, at 5-6.

- 5 -

[Counsel for the Trustees]: Okay. And they don't pay that walk up pay out of their pocket price either, do they?

[Counsel for Deeds]: Objection, Your Honor. That's not the legal standard of what the plaintiff is entitled to recover, and it's a total collateral source rule and we have a stipulation of what past medical costs are.

[The Court]: I'll sustain in part, but it's certainly okay to ask how she determined what the costs are.

Notes of Testimony ("N.T."), 10/31/2013, at 64-65. The court did not issue any curative instructions to the jury. Later that same day, counsel for the Trustees asked Nurse Corrigan "how the guarantee issue and the individual mandate portions of President Obama's Affordable Care Act will actually affect the future care costs in this case[.]" *Id.* at 81. Counsel for Deeds objected, and the trial court sustained the objection, but again, did not issue a curative instruction or provide any context for the jury.

During closing argument on November 8, 2013, counsel for the Trustees stated:

But here's what's critical, Ladies and Gentlemen, about Nurse Corrigan. Every item that she claims that Miss Deeds has, Miss Deeds already receives, except for a new house. She didn't tell you that Miss Deeds is lacking in a single care need; not one.

She has morning care, day care, afternoon care, overnight care, that is already provided in an obviously caring house. She has medical care, specialists, top rate schools, communication boards. Everything Nurse Corrigan mentioned, Miss Deeds already receives.

N.T., 11/8/2013, at 205. The overall effect of these comments was to suggest that Deeds' medical costs were being covered by Medicaid and the Affordable Care Act, and that she did not require (and accordingly could not

- 6 -

properly seek) any additional compensation.  This is a patent violation of the collateral source rule.  In this case, the violation requires remand for a new trial.

> Whether remarks by counsel warranted a new trial requires a determination based upon an assessment of the circumstances under which the statements were made and the precaution taken by the court and counsel to prevent such remarks from having a prejudicial effect.  It is the duty of the trial judge to take affirmative steps to attempt to cure harm.  However, there are certain instances where the comments of counsel are so offensive or egregious that no curative instruction can adequately obliterate the taint.

*Poust v. Hylton*, 940 A.2d 380, 386 (Pa. Super. 2007) (citation and emphasis omitted).

> While the primary focus of the collateral source rule is to avoid the preclusion or diminution of the damages otherwise recoverable from the wrongdoer based on compensation recovered from a collateral source, in some instances, the violation of the collateral source rule can affect the jury's deliberation and decision on the issue of liability.  As our Supreme Court noted in *Lobalzo v. Varoli*, 185 A.2d 557 (Pa. 1962), in some cases where there is a violation of the collateral source rule,
>
>> it is impossible to conjecture what influence the erroneously admitted evidence on workmen's compensation and unemployment compensation, as well as the misleading charge, had in bringing the jury to the conclusion it reached.  When an error in a trial is of such consequence that, like a dash of ink in a can of milk, it cannot be strained out, the only remedy, so that justice may not ingest a tainted fare, is a new trial.  The defendants' improper emphasis on the subject of an assumed double or triple payment may well have caused the jury to disbelieve the plaintiff with regard to his testimony on the manner in which the accident occurred.
>
> *Id.* at 561.

*Walsh*, 797 A.2d at 360 (citations modified).

Instantly, the Trustees' argument that Deeds' medical needs are currently being met may well have permitted Appellees impermissibly to benefit from "the fortuitous existence of a collateral remedy." *Beechwoods Flying Serv., Inc.*, 476 A.2d at 353. Although the trial court sustained Deeds' objections in the first two instances, it offered no curative or limiting instructions, nor did it otherwise direct the jury as to how it could or should evaluate the objectionable testimony. *See Poust*, 940 A.2d at 386. The teachings of our case law are clear: such suggestions by the Trustees may have improperly influenced the jury's determination. *See Walsh*, 797 A.2d at 260. On this record, we can have little confidence that the verdict as to Appellees' negligence *vel non* was unaffected by the collateral source evidence and argument. Accordingly, the trial court erred in denying Deeds' motion for a new trial. *See Maya*, 97 A.3d at 1224. The ink was in the milk; we cannot now extract it through magic or chemistry.

Inasmuch as we reverse and remand on the first issue, the prospect of a new trial requires that we address Deeds' remaining allegations of error. In her second issue, Deeds contends that the trial court erred in permitting separate counsel - - one representing the Trustees and one representing HUP - - to examine witnesses and present arguments individually to the jury, despite the fact that the Trustees were not an active party in the litigation and despite the fact that the Trustees did not appear on the verdict sheet. Deeds argues that this had the effect of "allowing the lone defendant

on the verdict slip to present two separate closing arguments and to examine witnesses as though the case involved two separately represented defendants." Deeds' Brief at 35. The trial court stated:

> [Deeds] fails to demonstrate any specific prejudice that resulted from the presence of two defense lawyers. Although Judge DeVito refused to remove counsel for the Trustees, he restricted cumulative questioning and limited counsel for the Trustees to questions related to the allegations against the Trustees['] employee, Dr. Ural. The presence of two separate defense counsel in and of itself cannot constitute reversible error.[17]
>
> [17] This [c]ourt cannot find anywhere in the record where the Trustees were dismissed as a party. If the Trustees remained a party, they were entitled to representation. If they did not remain in the case, there is still no error since [Deeds] points to no particular question by Defense Counsel that was improper or duplicative.

T.C.O. at 5 (one footnote and record citation omitted). We disagree with the learned trial court. Our review of the trial transcript reveals a deficiency in that court's description of the Trustees' participation. Under the circumstances, we are constrained to conclude that the trial court abused its discretion when it permitted counsel for the Trustees to remain.

After the first day of trial, once the jury was excused, Deeds' counsel challenged the propriety of allowing multiple advocates for the defense:

> [Counsel for the Trustees]: We have a stipulation that all the people who treated Tamika Peterson were the employees— I'm sorry, were the agents of the Hospital of the University of Pennsylvania.
>
> * * *
>
> [Counsel for Deeds]: Okay. But, in other cases that we've have [sic], so we can just give the [c]ourt a reference, and

in answers to interrogatories, they say that the Hospital of University of Pennsylvania is an unincorporated sub[div]ision of the Trustees of the University of Pennsylvania.

Essentially, Your Honor, my belief would be, since everybody worked just for the Hospital of University of Pennsylvania, there should be one attorney representing the defendants in this matter. The defendants shouldn't get two openings, two cross-examinations, two closing[s], and maybe even tonight with Doctor Fox, a direct and a cross, okay.

I think there should be one attorney for the hospital. They all work for the hospital. The hospital is a division of—it says an unincorporated division of the Trustees of the University of Pennsylvania.

You shouldn't get two bites at the apple because they decide to say, we're different people.

\*　　\*　　\*

I think, Your Honor, there should be one lawyer for the defendants in this case. The defendants have agreed in a stipulation that we read to the [c]ourt this morning and put on the record that they all work for HUP and, at best, [Dr.] Ural is an employee of the Trustees.

I don't think being an employee of the Trustees necessarily means he's their agent. They didn't stipulate that he was an agent, and they want to keep two defendants in for some coverage issues that they have with [the Medical Care Availability and Reduction of Error Act ("MCARE")].

N.T., 10/29/2013, at 163-66.

Counsel for HUP challenged the timing of Deeds' objection, arguing that "[i]f this was something that [Deeds] had an issue with, counsel needs to bring this up before." *Id.* at 168. Counsel for the Trustees maintained that Deeds' concern was raised too late, and argued that the Trustees and HUP are "two separate entities" and that the stipulation "was for coverage

- 10 -

reasons." *Id.* at 169.  Counsel for Deeds disagreed, asserting that the issue could not have been raised earlier because Dr. Ural's employment status had been left opaque by the fact that the Trustees had not "answer[ed] interrogatories or answer[ed] the complaint in any kind of fair way." *Id.* at 171.

The trial court agreed with Appellees, stating:

It should have been raised pre-trial because the jury has already heard about who [counsel for the Trustees] represents in his opening to the jury.

I think [counsel for HUP] is correct.  It's waived, it has not been raised prior to trial.

*Id.*  Thereafter, counsel for the Trustees remained an active participant in the trial, and was permitted to examine witnesses and to present closing arguments.  Nonetheless, when the case was sent back with the jury, only HUP appeared on the verdict slip.

Pursuant to Pa.R.C.P. 230, a plaintiff may declare a voluntary nonsuit to terminate litigation against a defendant once trial has commenced.[4]  In this case, however, counsel for Deeds did not declare a voluntary nonsuit against the Trustees.  Nor did Deeds identify any other procedural

---

[4]    "Pa.R.C.P. 230 declares a voluntary nonsuit to be the exclusive method of voluntary termination by a plaintiff during trial; that it may not be suffered without leave of court after plaintiff has rested his case; and that it is not permissible at all after the close of all of the evidence." *Deigan v. Deigan*, 232 A.2d 227, 229 (Pa. Super. 1967).

mechanism to remove the Trustees prior to submission of the verdict slip, which only named HUP. The trial court's conclusion that the Trustees were not dismissed as a party is correct. **See** T.C.O. at 5.

Pursuant to Pa.R.C.P. 223(2), the trial court may "[l]imit[] the number of attorneys representing the same party or the same group of parties, who may actively participate in the trial of the case or may examine or cross-examine a witness or witnesses[.]" Pa.R.C.P. 223(2).

> Under Rule 223 of the Pennsylvania Rules of Civil Procedure, local courts are empowered to make and enforce rules regulating the number and length of addresses to the jury. . . . Further, it has long been established that the addresses of counsel to the jury are especially subject to the regulatory powers of the trial judge. So long as no clear abuse of discretion exists or rights of due process are violated, an appellate court should not interfere.

**Burish v. Digon**, 206 A.2d 497, 499 (Pa. 1965).

In **Burish**, which involved cross claims for comparative negligence in a car accident, our Supreme Court found no error or abuse of discretion in the trial court's decision to limit Burish's counsel to one closing argument despite the fact that Burish was separately represented by counsel as an individual and by counsel for his insurance company because:

> The cross actions consolidated for trial arose out of the same facts and involved identical parties. Burish received the same treatment as his opposing litigant. None gained special advantage over the other. Burish was represented by [ ] both counsel as an individual, even though one may have been present to protect the interests of a company carrying liability insurance on his automobile. The fact that his counsel could not agree between themselves as to what the closing argument should include should not vitiate Digon's fairly won verdict. It must be further noted that if the second counsel were permitted

- 12 -

to argue, it was his declared purpose to maintain that both drivers were guilty of negligence and, therefore, neither should recover.

**Burish**, 206 A.2d at 499.

At the trial of the instant case, the Trustees argued that they remained an essential party because of coverage questions under MCARE. N.T., 10/29/2013, at 163-66, 169. Under similar circumstances in **Burish**, *supra*, our Supreme Court determined that the trial court properly limited the two attorneys with similar interests (one of which was financial coverage), to a single closing argument. **Burish**, 206 A.2d at 499. Here, the facts and claims pleaded against HUP and the Trustees were identical. Moreover, HUP and the Trustees had asserted no cross-claims against one another. HUP and the Trustees shared expert witnesses as well. They were members of "the same group of parties," and the matter of coverage alone did not require counsel for the Trustees' active participation. **See** Pa.R.C.P. 223(2); **Burish**, 206 A.2d at 499. There were in fact mechanisms for removing the Trustees once trial commenced. Contrary to the trial court's assertion that "[i]f the Trustees remained a party, they were entitled to representation," T.C.O. at 5, the trial court had discretion to limit trial participation by counsel for the Trustees.

We are unable to agree with the trial court's assertion that Deeds "fails to demonstrate any specific prejudice that resulted from the presence of two defense lawyers" because the court "limited counsel for the Trustees to questions related to the allegations against the Trustees['] employee, Dr.

- 13 -

Ural" and "[Deeds] points to no particular question by Defense Counsel that was improper or duplicative". T.C.O. at 5. As discussed above, counsel for the Trustees transgressed the collateral source rule on at least three occasions, transgressions which form the basis for the award of a new trial in this case. **See Walsh**, 797 A.2d at 360. The Trustees' questions, which involved improper inquiries into Deeds' existing financial coverage for her medical needs, went well beyond the scope of Deeds' allegations of negligence against Dr. Ural. **See** N.T., 10/31/2013, at 64-65, 81. Hence it cannot be maintained that the active and duplicative participation of counsel for the Trustees caused no prejudice to Deeds. **Cf.** T.C.O. at 5. The trial court abused its discretion by permitting counsel for the Trustees and counsel for HUP effectively to "tag team" Deeds at trial while representing the same interest. **See Burish**, 206 A.2d at 499.

Finally, inasmuch as we order a new trial, we must address Deeds' contention that the trial court erred and abused its discretion by "permit[ing] Dr. Samuel Parry, the attending physician for [Deeds'] c-section delivery [on January 20, 2001], to offer expert opinion testimony about the care the birth mother received from others two days earlier on the mother's previous visit to HUP's [Perinatal Evaluation Center ('PEC')]." Deeds' Brief at 40. Specifically, Appellees "did not identify Dr. Parry as an expert witness, nor was he identified in [Appellees'] answers to interrogatories as a treating physician who would be providing opinion testimony" but nonetheless "asked his opinion concerning whether [Deeds'] mother had preeclampsia on

January 18th, the equivalent of asking him as to whether or not [Appellees] violated the standard of care by not diagnosing [Deeds'] mother with preeclampsia on January 18th." **Id.** at 41-42. After careful review, we disagree.

Our standard of review for evidentiary rulings is narrow:

When we review a trial court's ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.

The admissibility of expert testimony is soundly committed to the discretion of the trial court, and the trial court's decision will not be overruled absent a clear abuse of discretion.

**Polett v. Public Communs., Inc.**, 83 A.3d 205, 218-19 (Pa. Super. 2013) (citations omitted).

"[T]he division [*sic*]whether testimony constitutes fact or opinion may be difficult, for there is no litmus test for fact versus opinion." **Bucchianeri v. Equitable Gas Co.**, 491 A.2d 835, 839 (Pa. Super. 1985) (internal quotation marks omitted). "[T]echnical expertise does not *ipso facto* convert a fact witness, who might explain how data was gathered, into an expert witness, who renders an opinion based on the data." **Branham v. Rohm & Haas Co.**, 19 A.3d 1094, 1110 (Pa. Super. 2011).

A pre-trial report by a non-party expert serves to inform the opposing side of the identity of a party's experts and the conclusions of the experts in order to prevent unfair surprise and prejudice at trial. However, a physician who is also a defendant

may testify as a fact witness in his own behalf without the prior filing of an expert's report.

**Havasy v. Resnick**, 609 A.2d 1326, 1333 (Pa. Super. 1992). "Fact testimony may include opinion or inferences so long as those opinions or inferences are rationally based on the witness's perceptions and helpful to a clear understanding of his or her testimony." **Brady by Brady v. Ballay**, 704 A.2d 1076, 1082 (Pa. Super. 1997).

In the instant case, Dr. Parry treated Deeds' mother, Tamika Peterson, on November 27, 2000, when she initially presented to HUP with back pain. Dr. Parry did not see Peterson on January 18, 2001, when she complained of headache, uterine contractions, and blurred vision, but was sent home. However, Dr. Parry was the attending physician on January 20, 2001, when Peterson suffered a placental abruption and Deeds was delivered by emergency caesarian section. Prior to Dr. Parry's testimony, Deeds objected, arguing:

> Doctor Parry . . . did not see the patient on [January] 18[th], did not participate in the care on the 18[th], and Doctor Parry will start talking about the care that took place on the 18[th] is not needed [*sic*].
>
> I've asked for an offer of proof and counsel told me well, he's going to talk about how the PEC worked and how the PEC was set up and how people were assigned to the PEC. We have already heard from every defense witness with the exception of Doctor Schwartz, who just left, about the PEC, how it was working, how it was set up.
>
> So, this is nothing but repetitive testimony by someone who is not there during any of the critical events that occurred.

\*      \*      \*

- 16 -

> So, I have to wonder, Your Honor, what he is going to testify to. If he is going to testify about the care that he rendered on the 20th, and the 21st, and the discharge summary that he wrote, then I think that he is a treating physician.

N.T., 11/6/2013 (Morning Session), at 113-15. After hearing from Appellees, the court held that Dr. Parry would be permitted to "testify about his contacts with Tamika Peterson," *id.* at 127, and to the extent that Dr. Parry relied upon notes in Peterson's file from the January 18, 2001 visit in order to diagnose the placental abruption on January 20, he would be permitted to so testify. *Id.* at 134. Thereafter, Dr. Parry was sworn in without being qualified as an expert witness. N.T., 11/6/2013 (Afternoon Session), at 7. Dr. Parry testified that he diagnosed Peterson with a placental abruption on January 20, and that after the emergency caesarian section, her blood pressure remained high. *Id.* at 60-61. He then explained as follows:

> So, otherwise, I thought Ms. Peterson was doing well. So I wrote routine post-op care. And now we have to from this point on make a decision why we had these elevated pressures because if I do think it's pre-eclampsia, pre-eclampsia after delivery, before delivering any time can lead to major medical problems for the mother. It can affect the liver, it can affect the kidneys. It can cause a woman to have a seizure. It can cause stroke.

> One of the major things it does is causes seizure. Pre-eclampsia then becoming eclampsia. When a woman has a seizure and if I think a woman has pre-eclampsia, I have to give her medicine to prevent a seizure which is magnesium sulfate. They hate that. It makes them feel weak like they have the flu. It's not a nice drug to give a woman. I don't give it to any woman that I have any suspicion of pre-eclampsia. We have to know for sure, does she have it or not. If she has, she has to get

- 17 -

magnesium sulfate for the next day to prevent her from having a seizure.

[Counsel for the Trustees]:   Doctor, if a patient truly has pre-eclampsia and doesn't get magnesium sulfate, what could happen?

[Parry]:     She could have a seizure.

[Counsel for the Trustees]:   Does any of that happen?

[Parry]:     No.

*Id.* at 62-63.  Dr. Parry described the monitoring and lab work performed to satisfy his diagnosis that Ms. Peterson did not have preeclampsia, and stated that he successfully treated her pregnancy-induced hypertension with magnesium sulfate.  *Id.* at 63-66.  Thereafter, counsel for the Trustees asked:

There is a distinction between—there is a mild pre-eclampsia and a severe pre-eclampsia, right, Doctor?  Did she have either mild pre-eclampsia or severe pre-eclampsia on January 20?

[Parry]:     No.

[Counsel for the Trustees]:  Did she have either mild pre-eclampsia or severe pre-eclampsia on January 18?

[Parry]:     No.

[Counsel for Deeds]:    Objection.

[Counsel for the Trustees]:   We went through the notes that he reviewed from the two days before.

The Court: Overruled.

*Id.* at 66.

Deeds argues that Dr. Parry's testimony that Deeds' mother did not have preeclampsia on January 18, 2001 expressed an expert opinion as to

- 18 -

standard of care. However, Dr. Parry's testimony that Peterson did not have preeclampsia on January 18 was based on his treatment and observation of Peterson, and was "helpful to a clear understanding of his . . . testimony." **Brady**, 704 A.2d at 1082. Although Dr. Parry discussed the basis for the course of Peterson's medical treatment and provided an explanation as to how she received care at the PEC based on his experience as an attending physician at the PEC, he did not render any opinion as to whether the PEC violated a standard of care on January 18. Therefore, the trial court did not err in admitting his testimony as a fact witness. **See Polett**, 83 A.3d at 218-19; **see also Branham**, 19 A.3d at 1110; **Bucchianeri**, 491 A.2d at 839. Hence, to the extent that this issue might arise upon retrial, we observe that Deeds' third issue would not merit relief on the present appeal.[5]

Having concluded that Deeds was irreparably prejudiced by Appellees' violations of the collateral source rule and "tag team" representation at trial, we reverse the judgment in favor of Appellees, and we remand for a new trial.

Reversed and remanded for new trial. Jurisdiction relinquished.

Judge Lazarus joins the opinion.

Judge Strassburger files a concurring and dissenting opinion.

---

[5]    Necessarily, we do not opine with respect to the permissibility at retrial of questions or answers different than those challenged on this appeal.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>1/30/2015</u>