J-A22008-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| CAROLE WILSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| UNIVERSITY OF PENNSYLVANIA MEDICAL CENTER, HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, FRANCIS MARCHLINSKI, M.D., AND THE CLINICAL PRACTICES OF THE UNIVERSITY OF PENNSYLVANIA | |
| Appellants | No. 703 EDA 2016 |

Appeal from the Order January 21, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): December Term, 2012 No. 000488

BEFORE:  BOWES, LAZARUS AND PLATT,* JJ.

MEMORANDUM BY  LAZARUS, J.:                    **FILED JULY 10, 2018**

The University of Pennsylvania Medical Center, Hospital of the University of Pennsylvania, Trustees of the University of Pennsylvania, Francs Marchlinski, M.D., and the Clinical Practices of the University of Pennsylvania (collectively "Defendants") appeal from the January 21, 2016 order granting a new trial to Plaintiff-Appellee Carol Wilson in this medical malpractice action. After a thorough review, we affirm the trial court's order.

_____
* Retired Senior Judge specially assigned to the Superior Court.

Following an eight-day trial in October and November 2015, a jury found in favor of Defendants. Wilson filed a post-trial motion seeking a new trial. The trial court granted Wilson's motion, based on the fact that defense counsel "repeatedly and deliberately" disregarded the court's ruling **and** made "improper and prejudicial" remarks, which denied Wilson a fair trial. See Trial Court Opinion, 10/31/16, at 10, 24.

Carol Wilson underwent a cardiac ablation procedure on December 6, 2010, at the University of Pennsylvania Hospital. Defendant Francis Marchlinski, M.D., performed the procedure, which proceeded uneventfully. Approximately six hours after the procedure, Wilson was administered heparin, an anticoagulant, to reduce the risk of a stroke. This case involved the Defendants' alleged failure to properly test and monitor Wilson's post-procedure heparin levels, resulting in an intracranial bleed and permanent deficits.

Wilson alleged that the applicable standard of care required that her heparin levels be tested six hours after the medication was restarted post-ablation. Instead, more than twelve hours elapsed before blood was drawn for the first time, and the results of that test indicated that Wilson's heparin levels were well in excess of the therapeutic range. At approximately that same time, Wilson was complaining of a headache, and Defendants gave her Motrin, which provided pain relief. Six hours later, Wilson reported to nurses that she had a migraine, with pain rated at a seven out of ten, and she was

given more Motrin. When the pain increased despite the Motrin, she was given an ice pack. Shortly thereafter, Wilson vomited, complained of an inability to hear in her right ear, and exhibited a change in her mental status. When Wilson's blood pressure spiked, Defendants discontinued the heparin and called the Rapid Response Team. A neurologist ordered a CT scan, which revealed intracranial bleeding. Wilson was taken to the operating room for emergency surgery to evacuate the bleed. Following surgery, she remained in the hospital for approximately three weeks, and spent another three months at a rehabilitation facility. Wilson received in-home therapy, and then underwent outpatient therapy for approximately ten months. Wilson suffers from permanent residual deficits due to the severe brain bleed. She requires assistance with "dressing, feeding, bathing, showering [and] toileting." N.T. Jury Trial, 10/28/15, at 29-30. *See* Trial Court Opinion, *supra* at 6.

Wilson commenced this medical negligence action alleging that Defendants did not follow hospital policy and "treatment set" for the administration of heparin post-ablation. Specifically, her heparin levels should have been tested six hours after it was re-started. A timely blood test would have revealed elevated levels in the early morning hours of December 7, 2010, and Defendants should have adjusted the dosage of heparin at that time. Instead, she continued to receive an excessive dose of heparin throughout the night, until the results of a 6:00 a.m. blood draw were reported at 7:00 a.m., and corrective action was taken. Wilson also maintained that Defendants'

failure to treat her headache as a possible indication of a bleed and more closely monitor her condition resulted in a delay in diagnosing the brain bleed and increased the risk of permanent injury.

In support of her claims, Wilson presented excerpts from the depositions of Defendant Dr. Francis Marchlinski, the electrophysiologist who performed the ablation procedure, Dr. David Lin, and Physician Assistant ("PA") Nancy Jacob. Wilson also introduced expert testimony from cardiologist Robert Stark, M.D., and Nurse Carrie Ann Merrifield, that Defendants and their agents and employees deviated from the standard of care in their post-ablation administration and monitoring of heparin, and that their negligence increased the risk of harm.

Defendants offered expert medical testimony that the dosage and testing were appropriate, that the Hospital's "treatment set" for heparin did not apply following an ablation, and that the Defendants responded promptly and appropriately to the symptoms of intracranial bleed.

The jury returned a ten to two verdict in favor of Defendants after less than one hour of deliberation. Wilson filed a post-trial motion seeking judgment notwithstanding the verdict ("JNOV") or a new trial based, *inter alia*, on defense counsel's repeated and deliberate refusal to comply with the court's rulings throughout trial, which she contended confused and distracted the jury. Following briefing and oral argument, the trial court granted the motion for a new trial on that basis.

Defendants filed this appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The trial court addressed those alleged errors in its Rule 1925(a) opinion, and the matter is ripe for disposition. Defendants present three issues for our review, all of which challenge the trial court's grant of a new trial:

1. Did the trial court err in ordering a new trial as a sanction against defense counsel for allegedly improper questions, where [Wilson] waived any request for a new trial under controlling Supreme Court case law because [Wilson] never requested a mistrial, or even a curative instruction, in the trial court?

2. Did the trial court abuse its discretion in ordering a new trial as a sanction against defense counsel for allegedly improper questions, where (i) counsel's questions were not improper, and (ii) the record demonstrates that there was no prejudice?

3. Did the trial court err and abuse its discretion in ordering a new trial as a sanction against defense counsel for allegedly improper questions, where [Wilson] never made out a *prima facie* case on the issue of causation, and should not now be awarded a "second bite at the apple"?

Appellants' Brief, at 5.

Generally, trial courts have broad discretion to grant or deny a new trial. ***Harman ex rel. Harman v. Borah***, 756 A.2d 1116, 1121 (Pa. 2000) (citing ***Martin v. Evans***, 711 A.2d 458, 461 (Pa. 1998)). As the ***Harman*** Court explained,

[t]he grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings. Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear

abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial.

*Harman*, 756 A2d at 1121-22 (internal citations and quotations omitted).

In ruling on the motion, the trial court uses a two-step process. "First, the trial court must decide whether one or more mistakes occurred at trial." *Id*. at 1122. "Second, if the trial court concludes that a mistake (or mistakes) occurred, it must determine whether the mistake was a sufficient basis for granting a new trial." *Id*. "A new trial is not warranted merely because some irregularity occurred during the trial or another trial judge would have ruled differently[.]" *Id*. Rather, the harmless error doctrine applies and "the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Id*. at 1121.

An appellate court also uses a two-pronged approach in reviewing the grant or denial of a new trial. *Id.* at 1122-23. First, utilizing the proper scope of review, we examine the trial court's finding that a mistake occurred. Where the trial court articulates a finite set of mistakes, our scope of review is limited to the reasons stated. *Id.* at 1123. Where, however, the trial court orders a new trial in the interest of justice, or leaves open the possibility that there are additional reasons not specifically mentioned that might warrant a new trial, our scope of review is broad, and we will examine the entire record for any justification for the grant of a new trial. *Id.*

Where we agree with the trial court that error has occurred, we "must determine whether the trial court abused its discretion in ruling on the request for a new trial." *Id.* "An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Id.* Where, however, the record "adequately supports the trial court's reasons and factual basis," we will not find an abuse of discretion. *Id.* (quoting *Coker v. S.M. Flickinger Co.*, 625 A.2d 1181, 1185 (Pa. 1993)).

Here, the trial court granted the motion for a new trial based on defense counsel's misconduct, which limits our scope of review to the reason stated. Our standard of review with respect to grant of a new trial due to inappropriate conduct of counsel was set forth in *Poust v. Hylton*, 940 A.2d 380 (Pa. Super. 2007):

> A new trial is to be granted where the unavoidable effect of counsel's conduct or language was to prejudice the fact finder to the extent that the fact finder is rendered incapable of fairly weighing the evidence and entering an objective verdict. If counsel's misconduct contributed to the verdict, it will be deemed prejudicial and a new trial will be required.

*Id.* at 385. In making the aforementioned assessment, we will examine the circumstances under which the statements were made, and what precautions the trial court took to alleviate any prejudice. *Hill v. Reynolds*, 557 A.2d 759, 765–66 (Pa. Super. 1989).

Preliminarily, Defendants contend that Wilson waived any right to seek a new trial because she did not request a mistrial or a curative instruction. Defendants rely upon *Tagnani v. Lew*, 426 A.2d 595 (Pa. 1981), for the proposition that when an objection to a question is sustained, and the party does not seek a curative instruction or a mistrial, the party has not preserved the right to subsequently seek a new trial on that ground. Defendants also direct our attention to *McMillen v. 84 Lumber Inc.*, 649 A.2d 932 (Pa. 1994), where defense counsel, in defiance of instructions precluding inquiry on direct examination into a warning label's compliance with government regulations, elicited the barred testimony. Plaintiff's counsel objected, but did not seek a curative instruction or a mistrial. When plaintiff sought a new trial based on defense counsel's misconduct, the trial court found the request waived due to the lack of a motion for mistrial, citing *Tagnani*, and the Supreme Court agreed.

Finally, Defendants cite *Straub v. Cherne Indus.*, 880 A.2d 561 (Pa. 2005), as support for a strict waiver rule. In *Straub*, the jury was given separate interrogatories addressing strict liability and negligence. Neither defendant nor plaintiff objected to the verdict slip. The jury found no defect, but found the defendant negligent. The defendant moved for JNOV, alleging that the product defect was the only evidence of negligence. The Supreme Court found the requested relief waived. Since defendant did not object to

the verdict slip or to the court's instructions regarding the verdict, the trial court had not had any opportunity to take corrective action.

Wilson counters that her repeated objections and the trial court's curative instructions were sufficient to preserve her right to seek a new trial. She directs our attention to Pa.R.C.P. 227.1(b)(1), which only requires litigants to make timely objections at trial to preserve the ability to seek post-trial relief. Wilson notes that **Straub** is consistent with Rule 227.1 and, that there, it was plaintiff's failure to object to the verdict form that resulted in waiver. Furthermore, she cites **Deeds v. Univ. of Pa. Medical Ctr.**, 110 A.3d 1009 (Pa. Super. 2015), where a new trial was granted due to the defense's improper questioning of a witness, notwithstanding that plaintiff did not seek a mistrial. Finally, Wilson reminds us that the trial court stated its intention to give a curative instruction, obviating the need for her to seek such relief.

The trial court distinguished **Tagnani** on its facts. In that case, there was one improper question, while here, the trial court found defense counsel interjected improper evidence *throughout* the trial. Wilson's counsel repeatedly objected and the court gave curative instructions to the jury. The trial court did not fault Wilson's counsel for not asking for a mistrial as it construed defense counsel's conduct as an attempt to provoke Wilson into such action. When that tactic failed, the defense moved for a mistrial, alleging that the court's tone and the substance of its comments had conveyed to the

jury that defense counsel's conduct was inappropriate, thereby prejudicing the defense. The trial court denied the motion, characterizing it as meritless and "yet another attempt to impugn on the fundamental fairness of the proceeding and to deny [Wilson] a fair trial." Trial Court Opinion, 10/31/16, at 29. The court held that granting a mistrial "would have rewarded Defense counsel's malfeasance[,]" and that the defense motion relieved Wilson "of any duty to move for a mistrial." *Id.* The trial court stated that it would not have granted a mistrial regardless of which party had asked for one.

Our review of the record confirms that Wilson's counsel objected numerous times, and the majority of the objections were sustained. In many instances, the trial court announced that it would give curative instructions to the jury before Wilson could even request them. We find no waiver where the trial court *sua sponte* issued curative instructions. The purpose of objections and requests for curative instructions, *i.e.*, to allow the court the opportunity to take corrective measures and avoid a new trial, was served. Moreover, we recognize that even where a curative instruction is given, a new trial may still be warranted if an instruction could not cure the prejudice. The trial court's grant of a new trial was based on that rationale.

Turning to the merits, Defendants allege that the trial court abused its discretion in granting a new trial as there was no misconduct on the part of defense counsel and no prejudice. Defendants contend that the record does not support the trial court's finding that defense counsel deliberately

disregarded its rulings and made prejudicial improper remarks. Furthermore, they argue that many of the leading questions were either not leading at all, or properly employed to develop testimony. Moreover, Defendants challenge the trial court's finding that defense counsel's examination of witnesses was improperly repetitive and cumulative, and that he exceeded the scope of allowable testimony.

We find ample record support for the trial court's conclusion that defense counsel, despite admonishment from the court, repeatedly attempted to introduce evidence beyond the scope of the court's rulings, thereby diverting attention from the issues. At trial, Wilson stipulated that there was no negligence in the performance of the ablation procedure; the negligence occurred in the post-procedure administration of heparin. Although the defense acknowledges on appeal that, "[w]hether the procedure was 'successful' or 'properly' performed was not the issue[,]" Appellants' Brief, at 46, *defense counsel repeatedly disregarded the trial court's directive to focus on the relevant post-procedure care and treatment*. This conduct was most pronounced during the direct examination of defendant Dr. Marchlinski.

The record reveals the following. Prior to Dr. Marchlinski's direct testimony, counsel for Wilson asked for an offer of proof. Defense counsel stated that he was going to spend a lot of time talking about what an ablation is, the difference between a left-side ablation and a right-side ablation, and what portions of the heart were affected. N.T. Jury Trial, 10/29/15, at 7.

Counsel for Wilson argued that such testimony was irrelevant as there was no issue with the ablation, and that the case and Dr. Marchlinski's testimony should be confined to the events after Defendants re-started the heparin six hours following the ablation procedure until the bleed was detected. Wilson requested the court to instruct defense counsel not to go into the other areas, and further, not to elicit testimony from the defendant physician that he had performed thousands of these procedures and that Wilson was the first to have a brain bleed.[1] *Id.* at 7-8. After considerable argument from defense counsel, *see id.* at 9-17, the trial court agreed with Wilson's counsel and so instructed defense counsel. *Id.* at 17.

Despite being advised repeatedly by the court to curtail inquiry into the ablation itself, as it was confusing the jurors and diverting their attention from the issue at hand, defense counsel persisted in revisiting the performance of the ablation procedure. In response to the trial court's inquiry as to why he would continue to elicit testimony about the ablation, defense counsel insisted that it was "part of the heart of the defense in this case." *Id.* at 10. Counsel added that the heparin dosage related to the risk of clotting in this particular patient. When the court advised counsel that he could elicit testimony about the amount of heparin without confusing the jury with the details of the

---

[1] In his opening statement, defense counsel informed the jury that, "this is the only patient to whom we have had . . ." N.T. Trial, 10/26/15, at 89. Plaintiff's counsel objected and the objection was sustained. *Id.*

ablation procedure, counsel reassured the court that he could show the jury where the ablation was in "five minutes at most." *Id*. at 11. Wilson's counsel argued that defense counsel was trying to divert the focus from the amount of heparin. The trial court ruled that the ablation procedure was not relevant, and that defense counsel was not to explore it in any depth as it would confuse the jury. ("The Court is instructing you not to go into any detail about this ablation. Because why? It's not the issue. The issue is what happened thereafter.") *Id*. at 15. Defense counsel could show the jury where the ablation occurred. He could not tell the jury that a hemorrhage never occurred before. *Id*. at 17.

Notwithstanding defense counsel's acknowledgement that he understood the parameters, he spent considerable time discussing the ablation. Counsel sought to introduce Exhibit 4, a summary of Dr. Marchlinski's meeting with Wilson prior to the procedure; Wilson objected on relevancy grounds, and the court sustained the objection. *Id*. at 56-57. Defense counsel spent forty minutes questioning Defendant Marchlinski about his credentials for performing ablation surgery and segued into what Dr. Marchlinski had advised Wilson about the risks of the procedure. Again, Wilson's counsel objected that there was no informed consent claim, and that the areas of the heart affected were irrelevant. The court agreed, stating. "I believe it's an attempt to really confuse the jury, and I am going to go out there and let the jury know ablation is not the issue in this case. It never

was." *Id.* at 61. The court insisted that it did not want the jury to be confused and stated, "I think that's what you're attempting to do, to confuse them." *Id.* at 63.

Defense counsel, again ignoring the court's clear directive, returned to questioning Dr. Marchlinski about the ablation procedure. The witness expounded at length regarding ACT I heparin levels during the procedure. Plaintiff's objection that the response went far beyond the question posed was sustained. *Id.* at 74. Nonetheless, defense counsel exhaustively explored and re-explored the subject of heparin levels during the procedure. When an objection was sustained on the basis that the question was asked and answered, defense counsel returned to the subject of the ablation procedure and elicited testimony about how a clot can form during the procedure, which did not occur in Wilson's case. Wilson's counsel objected and the objection was sustained.

Direct examination then focused on Dr. Marchlinski's opinion of care rendered by other members of his team. Absent a proper foundation, the court sustained Plaintiff's objections. The court advised counsel:

> THE COURT: These are issues you don't have to discuss in front of the jury. The jury needs to know what information they should hear and listen to. And so my job is, of course, to make certain rulings on certain objections, to advise counsel, both counsel what's going to be inappropriate and what's appropriate. So let's limit that. Ask the appropriate questions, and we'll go from there. Okay.

N.T. Jury Trial, 10/29/15, at 105.

Defendants contend that their counsel was not deliberately defying the trial court's rulings, pointing to defense counsel's insistence that he merely was trying to figure out the parameters set by the trial court. We note that the trial court initially took a forceful stance against any testimony regarding the ablation procedure, but softened that position in response to defense counsel's argument. Ultimately, the court permitted defense counsel to show the jury where the procedure occurred and discuss the heparin levels during the procedure. Nonetheless, the trial court perceived defense counsel as defying its rulings. Even when cautioned that the court viewed counsel's conduct as calculated to confuse the jury, defense counsel did little to dissuade the court of that notion. Since this Court was not present, and thus in an inferior position to evaluate counsel's motivations, we defer to the trial court's assessment that defense counsel was deliberately defying the court's rulings regarding the scope of inquiry.

The trial court also found that defense counsel intentionally persisted in the use of leading questions on direct examination. Defendants argue that the questions were not leading, but were only calculated to develop testimony. Furthermore, since the objections were sustained, Defendants contend that no inadmissible evidence was placed before the jury and no prejudice resulted.

We agree that not all of the purportedly leading questions were in fact leading, although many were. By definition, a leading question either contains or suggests the answer the interrogator wants to elicit from his own witness.

*Commonwealth v. Chambers*, 588 A.2d 630 (Pa. 1991). Leading questions generally are not permitted on direct or redirect examination except as needed to develop a witness's testimony, as they tend to undermine the aim of the rules of evidence to elicit the truth. Pa.R.E. 611(c); *see also In re Rogan's Estate*, 171 A.2d 630 (Pa. 1991). While there are exceptions to the use of leading questions for interrogating hostile witnesses, witnesses who have difficulty understanding, for eliciting background information or laying a foundation for an exhibit, those exceptions were not implicated here. The trial court sustained numerous objections to defense counsel's leading questions and cautioned him. The trial court concluded that defense counsel's improper questioning was deliberate and "not the result of a mistake or misunderstanding." Trial Court Opinion, 10/31/16, at 15.

In the same vein, the court found defense counsel's interrogation to be intentionally repetitive and cumulative. The trial court cited numerous instances where counsel attempted to rehash direct testimony on redirect examination, and disregarded the court's directives to avoid repetitive questioning. Throughout, the trial court attempted to keep the trial focused and on course despite what it perceived as defense counsel's deliberate attempts to derail it. The court repeatedly expressed concern that defense

counsel's tactics were intended to confuse the jury and took steps to curtail his conduct.[2]

We find that the record substantiates the objectionable conduct of defense counsel. Despite acknowledging that he understood the court's rulings, defense counsel insisted on discussing whether the ablation procedure was properly performed. As the trial court noted, defense counsel's conduct was "deliberate." Trial Court Opinion, 10/31/16, at 23. "Defense [c]ounsel's conduct was prejudicial to the Plaintiff and suggested an intent to provoke the plaintiff into moving for a mistrial." *Id.*[3]

_____

[2] The following discussion was held outside the presence of the jury:

> THE COURT: I've allowed you leeway on the record now for at least 45 minutes or so for you to give some background information about the doctor, for you to go in – even though counsel objected several times. I overruled his objection a few times, because I want to give you some leeway. Why? To give the jury some foundation of the witness that we're dealing with. I don't have a problem with that. Now you're really pushing it further than where I told you to go. And the reason why I say that too is because, like I said before. I don't want the jury to be confused. **I think that what you're attempting to do, [is] to confuse them**. . . . Your four minutes has turned into 30 to 50. No, you're not doing that. . . . We're going to try and focus. That's not going to be hijacked anyplace else. That the ruling of the [c]ourt.

N.T. Jury Trial, 10/29/15, at 57-67 (emphasis added).

[3] The trial court also stated that when defense counsel's efforts to precipitate a mistrial failed, he moved for a mistrial on behalf of the Defendants, arguing that the court's "tone" and "body language" communicated "favoritism on the

Defendants contend, however, that there was no prejudice that would require a new trial. They argue that the only evidence of prejudice was an email from the jury foreperson, a dissenting juror, to one of the plaintiff's attorneys discussing the nature of the jury's deliberations. They maintain that the trial court's consideration of the email violated the "no-impeachment rule" as the email did not relate to outside influences that affected deliberations.

The trial court, however, made it quite clear that it did not rely upon the email in finding prejudice. Since Wilson raised an outside influence claim in her post-trial motion, the trial court was required to view the email to determine the validity of that claim. The court determined that there was no outside influence and *properly disregarded the email in ruling on the new trial motion*. We find no error or abuse of discretion in this regard. ***Carter by Carter v. U.S. Steel Corp.***, 604 A.2d 101, 103 (Pa. 1992).

_____

part of the [c]ourt." N.T. 10/29/15, at 291-21. The court denied the Defense Counsel's motion for mistrial, stating:

> You have continued to disregard my rulings I've made in the back and prior. And I've addressed you and admonished you on the record. Clearly, it's in the presence of the jury, because you've done it in the presence of the jury, and in the back. You've been in the back there several times. I said things to you and you directly would come and do something totally opposite of what I said. So I don't know if it's your attempt to hijack the trial or whatever. I don't know. I as the judge just make the rulings and make the calls. There's no basis for mistrial.

***Id.*** at 222-23.

- 18 -

Absent the email, Defendants contend that there is no evidence of prejudice. The trial court repeatedly admonished defense counsel for disregarding its rulings, asking leading questions, and engaging in repetitive questioning beyond the proper scope of interrogation. Several times the court instructed the jury that the performance of the ablation procedure was not the issue in the case and that they were to focus their attention on the post-procedure heparin therapy. Defendants contend that the trial court's curative instructions were more than sufficient to cure any perceived prejudice. We disagree.

The power to grant a new trial lies inherently with the trial court; we will not reverse absent a clear abuse of discretion or error of law. **Young v. Washington Hospital**, 761 A.2d 559, 561 (Pa. Super. 2000). Here, as stated above, the court granted a new trial based on defense counsel's misconduct; our scope of review, therefore, is limited to the reason stated, and we must determine whether the unavoidable effect of defense counsel's conduct or language prejudiced the factfinder "to the extent that the factfinder was rendered incapable of fairly weighing the evidence and entering an objective verdict." **Poust,** 940 A.2d at 385. "If [counsel's] misconduct contributed to the verdict, it will be deemed prejudicial and a new trial will be required." **Id.** Thus we consider whether the court abused its discretion or committed an error of law in its decision on that stated basis only. **Coker**, 625 A.2d at 1185–86.

The record clearly demonstrates that defense counsel repeatedly and deliberately disregarded the court's rulings throughout trial, introducing cumulative evidence and eliciting repetitive and irrelevant testimony. Defense counsel's repetitive questioning, intentional persistence in asking leading questions, and defiance of the court's directives confused the jury and dragged the questioning out beyond what was necessary for a clear presentation of the case. In its opinion, the court recounted thirteen pages of testimony illustrating this. **See** Trial Court Opinion, 10/31/17, at 10-23. The "cumulative effect" of Defense counsel's sustained derailment of the proceedings "was highly prejudicial and deprived Plaintiff of a fair trial." **Id.** at 24. We agree with Wilson's argument that the trial court was uniquely positioned to make this determination. The trial court properly characterized Defense counsel's improper conduct throughout trial" as "ink in a can of milk; it could not be strained out." Trial Court Opinion, 10/31/16, at 31, citing **Lobalzo v. Varoli**, 185 A.2d 557, 561 (Pa. 1962). The court's determination is supported in the record. **Coker**, **supra**. We find no clear abuse of discretion. **Harman**, **supra**; **Young**, **supra**. **See also Morrison v. Dep't of Pub. Welfare**, 646 A.2d 565 (Pa. 1994).

Finally, Defendants argue the trial court erred and abused its discretion in ordering a new trial based on defense counsel's improper conduct where Wilson never made out a *prima facie* case of negligence. Specifically, Defendants claim there was a "failure of proof" on the issue of causation.

- 20 -

Appellants' Brief, at 53.    In particular, Defendants argue Wilson's counsel

"admitted" that heparin did not cause Wilson's bleeding, that "[Wilson] failed

to introduce any evidence to establish what actually did cause [her] bleeding,"

and that "[Wilson] failed to introduce any evidence that [her] outcome would

have been any different at any therapeutic level of Heparin."  **See** Defendants'

Pa.R.A.P. 1925(b) Statement of Errors Complained of on Appeal, 2/23/17, at

3; Appellants' Brief, at 53-58. Defendants claimed, therefore, that they were

entitled to a directed verdict. Appellant's Brief, at 58.[4]

> Once a plaintiff has introduced evidence that a defendant's
> negligent act or omission increased the risk of harm to a person
> in the plaintiff's position, and that the harm was in fact sustained,

---

[4]  We note that Defendants did not seek a non-suit at the close of Wilson's case, nor did Defendants move for a directed verdict at the conclusion of the evidence. Although Defendants neglect to point to where in the record this issue is preserved, we note that Wilson, in her argument in response to this issue, notes that "the only way this issue was even conceivably preserved was because [D]efendants' proposed jury instruction contained a binding instruction for the jury to return a verdict in favor of defendants."  Wilson's Brief, at 35.  **See** Pa.R.C.P. 227.1(b) ("Except as otherwise provided by Pa.R.E. 103(a), post-trial relief may not be granted unless the grounds therefor, (1) if then available, were raised in pre-trial proceedings or by motion, objection, point for charge, request for findings of fact or conclusions of law, offer of proof or other appropriate method at trial[.]"). Although Defendants present no authority specifically stating that a jury instruction preserves their claim that they were entitled to a directed verdict, we will not find waiver here. **See Thomas Jefferson University v. Wapner**, 903 A.2d 565, 572-73 (Pa. Super. 2006); **Soderberg v. Weisel**, 687 A.2d 839, 845 (Pa. Super. 1997).  **We advise counsel for Defendants to consult the rules of court, Pa.R.A.P. 2117(c) and Pa.R.A.P. 2119(c) (requiring brief expressly set forth in both statement of the case and argument reference to place in record where issue present for decision on appeal has been raised or preserved below).**

it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm.

*Hamil v. Bashline*, 392 A.2d 1280, 1286 (1978).

Here, as we have recounted above, Wilson presented evidence that Defendants failed to follow the hospital treatment for post-ablation administration of heparin. Wilson's heparin levels should have been tested six hours after administration was re-started, and, further, a timely blood test would have revealed elevated levels in the early morning hours of December 7, 2010. Wilson presented evidence that Defendants should have adjusted her dosage of heparin at that time, and instead continued to administer an excessive dose of heparin throughout the night, until the results of a 6:00 a.m. blood draw were reported at 7:00 a.m., and corrective action was taken. Further, Wilson maintained that Defendants' failure to treat her headache as a possible warning of a bleed and more closely monitor her condition resulted in a delayed diagnosis of the brain bleed and an increased risk of permanent injury.

Wilson presented excerpts from the depositions of Defendant Dr. Francis Marchlinski, the electrophysiologist who performed the ablation procedure, Dr. David Lin, and Physician Assistant ("PA") Nancy Jacob. Wilson also introduced expert testimony from cardiologist Robert Stark, M.D., and Nurse Carrie Ann Merrifield, that Defendants and their agents and employees deviated from the standard of care in their administration and monitoring of heparin post-ablation, and that their negligence increased the risk of harm.

In her opinion, Judge Paula Patrick carefully recounted the evidence that supported Wilson's theory of liability, in particular the issue of causation/increased risk of harm. ***See*** Trial Court Opinion, 10/31/16, at 35-41. Wilson presented the expert testimony of three witnesses, all of whom testified that Defendants' deviation from the standard of care caused Wilson's injuries. ***See id.*** at 38-41, quoting N.T. Jury Trial, 10/26/15, at 122-24, 128, 134-39, 145-47; N.T. Jury Trial, 10/27/15, at 55-57. The evidence was sufficient to establish a *prima facie* case that Defendants' deviation from the standard of care in their post-ablation administration of heparin to Wilson, a high-risk patient, caused the delayed diagnosis and increased the risk of harm to Wilson.[5] We find no error or abuse of discretion. ***See Carrozza v. Greenbaum***, 866 A.2d 369, 380-81 (Pa. Super. 2004) (court may send issue of causation to jury as long as reasonable minds could conclude that

---

[5] Donna Damm, N.P., testified that she entered an order on December 6, 2010, to administer 1000 units of heparin to Wilson, that she did not consider Wilson's natural partial thromboplastin time ("PTT") when making this dosing decision, and that she did not obtain a PTT prior to entering the order. N.T. Jury Trial, 11/2/15, at 56, 77, 82. Further, she testified that she did not order a PTT six hours after the heparin was administered, despite acknowledging this was common practice. ***Id.*** at 59-60. NP Damm provided the following rationale for this decision:

> It was going to be the middle of the night when she was going to have to have the blood draw for her heparin dosing. She was going to have to have routine blood draws anyway at 5:00 a.m. I chose to allow her to rest through the night and have one blood stick rather than two.

***Id.*** at 60.

preponderance of evidence shows defendant's conduct was substantial factor in causing resulting harm).

Order affirmed.

Judge Platt joins the Memorandum.

Judge Bowes files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/10/18