J-A14011-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| SALLY QUIVERS, ADMINISTRATRIX OF THE ESTATE OF GARY LEE QUIVERS, SR. AND SALLY QUIVERS, AN INDIVIDUAL | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 745 WDA 2018 |
| | : | |
| GENE W. MANZETTI, M.D.; MICHAEL LEMENTOWSKI, M.D.; THAD OSOWSKI, M.D.; AND MONONGAHELA VALLEY HOSPITAL | : | |

Appeal from the Judgment Entered April 26, 2018
In the Court of Common Pleas of Washington County
Civil Division at No(s): No. 2014-2187

| | | |
|---|---|---|
| SALLY QUIVERS, ADMINISTRATRIX OF THE ESTATE OF GARY LEE QUIVERS, SR. AND SALLY QUIVERS, AN INDIVIDUAL | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | No. 814 WDA 2018 |
| | : | |
| GENE W. MANZETTI, M.D., MICHAEL LEMENTOWSKI, M.D., THAD OSOWSKI, M.D., AND MONONGAHELA VALLEY HOSPITAL | : | |

Appeal from the Judgment Entered May 10, 2018
In the Court of Common Pleas of Washington County
Civil Division at No(s): 2014-2187

BEFORE: OTT, J., KUNSELMAN, J., and MUSMANNO, J.

J-A14011-19

MEMORANDUM BY OTT, J.:                    FILED DECEMBER 27, 2019

Sally Quivers, as the administratrix of the estate for her husband, Gary Lee Quivers ("Decedent"), and in her individual capacity (collectively, "Quivers"), appeals from the May 10, 2018, judgment entered in the Washington County Court of Common Pleas in favor of Gene W. Manzetti, M.D., Michael Lemontowski, M.D., Thad Osowski, M.D., and Monongahela Valley Hospital ("Mon Valley Hospital") (collectively, "Defendants").[1]  On appeal, Quivers raises the following claims:  (1) the trial court erred in denying Quivers' motion in limine to exclude cumulative expert testimony and to exclude the testimony of defense expert, John Christian Caldwell, M.D., as well as motions during trial to exclude or strike Dr. Caldwell's testimony; (2) the trial court erred in denying Quivers' motion for a mistrial at the conclusion of Dr. Caldwell's testimony; (3) the trial court erred in permitting Mon Valley Hospital to offer expert testimony and argument in its defense when there were no direct claims of negligence against it at trial; and (4) the trial court erred in failing to permit the direct testimony of plaintiff expert, Paul Yodice, M.D., regarding intraoperative care.  Based on the following, we affirm.

The trial court set forth the facts and procedural history as follows:

_____

[1] Quivers filed two appeals from four separate judgments entered in favor of the various defendants on April 26, April 30, and May 10, 2018, on a June 23, 2017, verdict.  The appeals are docketed at 745 WDA 2018 and 814 WDA 2018.  On July 18, 2018, Quivers filed an application to consolidate these appeals, which was granted six days later.

- 2 -

[Decedent] died in the recovery room (PACU) of the Monongahela Valley Hospital following elective surgery for a hiatal hernia. At the time of his death he was sixty (60) years old; he was married for 31 years and had two adult sons. He was employed by Columbia Gas for over 30 years. At the time of his death, [Decedent] was on a medical leave for a non-work related injury to his shoulder. He was a hardworking, active man who enjoyed cooking, golf and completing home improvement projects for family.

At the trial, his medical history was elicited. [Decedent] was seen regularly by the same primary physician for approximately 20 years. He was a heavy cigarette smoker. His family had a history of heart disease and diabetes. He was overweight and suffered from sleep apnea. In November of 2011, [Decedent] visited the emergency room of Mon Valley Hospital with a complaint of chest pain and coughing. He was diagnosed with bronchitis, given prescriptions and released to see his primary doctor. In February of 201[2], he was taken by ambulance to the emergency room due to a complaint of severe chest pain. His diagnosis was pneumonia and broken rib, which was a result of intense coughing. A CT scan taken at that time revealed a hiatal hernia. Dr. Manzetti, a general surgeon, was consulted at the hospital concerning the hernia. He recommended surgery to repair the hernia and [Decedent] agreed. Dr. Manzetti ordered pre-operative tests. An EKG, chest x-ray, lab work and pulmonary function tests were performed. [Decedent] also took a barium swallow test. Insurance approval was sought to cover the surgery; [Decedent's] insurance company did not have Dr. Manzetti as an approved provider and Dr. Manzetti then requested Dr. Lementowski to be the primary surgeon while he would assist in the surgery. After all the tests were completed and reviewed by Dr. Manzetti and Dr. Lementowski, the surgery was scheduled for April 19, 2012.

This elective surgery took four hours at Mon Valley Hospital. During his surgery Dr. Osowski, the anesthesiologist, was administering medications and monitoring heart rate and blood pressure, oxygen saturation and gases, urine output and brain activity. [Decedent's] vital signs fluctuated during the surgery and recovery. The doctors began performing the surgery laparoscopically but converted to an open procedure due to the number and strength of adhesions found around the stomach and esophagus. The doctors found the hiatal hernia to be extensive

and were able to successfully repair it. After surgery, [Decedent] was extubated and sent to the PACU for recovery. After extubation, he was wheezing and he remained on oxygen. He woke up, he talked with the nurse and he talked with both Dr. Lementowski and Dr. Osowski. Thirty minutes after the surgery ended, while [Decedent] was being given a chest x-ray in the PACU, he became unresponsive and lost consciousness. His heart stopped. All three defendants and the hospital staff performed life saving measures for over an hour to no avail. An autopsy was subsequently performed.

[Quivers] filed a Wrongful Death and Survival Action asserting professional negligence claims against each of the three physicians and the hospital. [Quivers] claimed that based on [Decedent's] medical history and current testing, elective surgery was contraindicated until further cardiac evaluation was performed and that the doctors failed to recognize the increase risk to [Decedent] and that the monitoring of [Decedent] intraoperatively and postoperatively fell below the standard of care and that [he] was untimely extubated. The complaint also asserted corporate negligence against the hospital for granting privileges to Dr. Manzetti[1] and for ostensible agency liability as to Dr. O[s]owski.

At trial many medical experts were offered. On behalf of [Quivers], Dr. Leo Frangiapane testified as to the care of the surgeons and Dr. Brian White testified as to the care of the anesthesiologist. Dr. Paul Yodice also testified as to care by Drs. Lementowski and Osowski. On behalf of Defendant Manzetti, Dr. James Gregory testified and for Defendant Lementowski, Dr. Miles Weaver testified. Dr. Osowski offered expert opinions from Dr. Gregory Marchewka and Dr. Louis Wickas. Mon Valley Hospital presented Dr. John Caldwell.

_____

[1] Other bases for corporate negligence were dismissed before trial.

_____

Trial Court Opinion, 9/28/2018, at 1-4 (record citations omitted).

At the conclusion of the two-week trial, the jury found in favor of the

Defendants on all claims. "[Quivers] filed a timely post-trial motion. After

- 4 -

the passage of the requisite one hundred twenty (120) days pursuant to Pa.R.C.P. Rule 227.4(b) and before argument was requested and scheduled on the post-trial motion, judgment was entered in favor of the Defendants." Id. at 1. This appeal followed.[2]

Based on the nature of Quivers' first and second arguments, we will address them together as they both concern Dr. Caldwell, an expert witness for Defendant, Mon Valley Hospital. In Quivers' first argument, she complains the trial court erred in failing to grant her motions in limine to exclude the expert testimony of Dr. Caldwell as well as motions made during trial to exclude or strike Dr. Caldwell's testimony. See Quivers' Brief at 37. She contends that pursuant to Pennsylvania Rule of Evidence 403, Dr. Caldwell should have been excluded based upon the fact that his pretrial report was cumulative, repetitive, and duplicative of the testimony of the two other defense expert witnesses, Dr. Marhefka and Dr. Wickas, offered by Dr. Osowski. Id. at 38. Furthermore, Quivers argues the court should have limited the number of experts because it "acknowledged in its [Rule] 1925(b) opinion that the testimony of Dr. Caldwell had 'some duplication' of the testimony of Dr. Marhefka and Dr. Wickas, and that 'some of' the testimony

_____

[2] On May 24, 2018, the trial court ordered Quivers to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Quivers filed a concise statement on June 13, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on September 28, 2018.

of Drs. Marhefka, Wickas, and Caldwell was cumulative." Id. at 42 (reproduced record citation omitted). Furthermore, Quivers claims:

> In addition to being duplicative and cumulative, having three expert witnesses testify on behalf of Dr. Osowski (and by practical extension, Mon Valley Hospital) was confusing to the jury and was unfairly prejudicial to [Quivers]. Offering three identical conclusions as to the standard of care and causation and may have convinced the jury that the number of experts, rather than the credibility of the expert testimony, was a salient factor in reaching their verdict.

Id. at 43.

In Quivers' second argument, she asserts that her motion for a mistrial at the conclusion of Dr. Caldwell's direct testimony should have been granted because the court agreed that the testimony at issue was duplicative and repetitive. Id. at 44-46. Likewise, she states the court abused its discretion by declining to provide any curative or limiting instruction to the jury regarding Dr. Caldwell's repetitive testimony. Id. at 47-48.

We are guided by the following:

> A trial court's decision to grant or deny a motion in limine is subject to an evidentiary abuse of discretion standard of review. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and we will not reverse the court's decision absent a clear abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, to constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

Dibish v. Ameriprise Financial, Inc., 134 A.3d 1079, 1095 (Pa. Super.

2016) (citation omitted), appeal denied, 141 A.3d 481 (Pa. 2016).

Additionally,

> the admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. Thus[,] our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

Hawkey v. Peirsel, 869 A.2d 983, 989 (Pa. Super. 2005), quoting Turney

Media Fuel, Inc., v. Toll Bros., 725 A.2d 836, 839 (Pa. Super. 1999)

(citations omitted). See also Crespo v. Hughes, 167 A.3d 168, 181 (Pa.

Super. 2017), appeal denied, 184 A.3d 146 (Pa. 2018).

Pursuant to Rule 403, "[t]he court may exclude relevant evidence if its

probative value is outweighed by a danger of one or more of the following:

unfair prejudice, confusing the issues, misleading the jury, undue delay,

wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403

(emphasis added). Cumulative evidence has been defined as,

> "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." ... Evidence that bolsters, or strengthens, existing evidence is not cumulative evidence, but rather is corroborative evidence.

Commonwealth v. G.D.M., Sr., 926 A.2d 984, 989 (Pa. Super. 2007) (quotation omitted), appeal denied, 944 A.2d 756 (Pa. 2008).[3]  See also Klein v. Aronchick, 85 A.3d 487, 501 n.7 (Pa. Super. 2014) (citing G.D.M., supra), appeal denied, 104 A.3d 5 (Pa. 2014).[4]

Lastly, "[i]n reviewing a challenge to the trial court's refusal to give a specific jury instruction, it is the function of this Court to determine whether the record supports the trial court's decision."  Commonwealth v. Kendricks, 30 A.3d 499, 507 (Pa. Super. 2011) (citation omitted), appeal denied, 46 A.3d 716 (Pa. 2012). "[O]ur standard of review when considering the denial of jury instruction is one of deference—an appellate court will

---

[3]  It also bears remarking "there is a subtle difference between evidence that is 'corroborative' and evidence that is 'cumulative.'  In the most general sense, corroborative evidence is '[e]vidence that differs from but strengthens or confirms what other evidence shows,' while cumulative evidence is '[a]dditional evidence that supports a fact established by the existing evidence.'  Black's Law Dictionary. 674, 675 (10th ed. 2014)."  Commonwealth v. Small, 189 A.3d 961, 972 (Pa. 2018).

[4]  In Klein, supra, a panel of this Court concluded there was no error when a trial court permitted the defendants to present "three different expert witnesses on causation" because, while the experts "ultimately reached the same conclusion, … they approached the issue from different clinical perspectives."  Id. at 501 n.7.  Similarly, in Whitaker v. Frankford Hosp. of City of Philadelphia, 984 A.2d 512 (Pa. Super. 2009), a panel of this Court determined the trial court did not abuse its discretion when it permitted the plaintiffs to present two expert witnesses who each "touched briefly upon the subject matter that was thoroughly covered by the other expert witness."  Id. at 522-523.  The panel noted "[e]ach expert witness clearly and unequivocally established the necessary component of liability in his area of expertise[,]" and the "slightly cumulative nature of the intersecting testimony was not so harmful" that it required a new trial.  Id. at 522-523.

reverse a court's decision only when it abused its discretion or committed an error of law." Commonwealth v. Baker, 24 A.3d 1006, 1022 (Pa. Super. 2011) (citation omitted), aff'd, 78 A.3d 1044 (Pa. 2013). "When evaluating jury instructions, the charge must be read as a whole to determine whether it was fair or prejudicial." Commonwealth v. Prosdocimo, 578 A.2d 1273, 1274 (Pa. 1990).

Here, the trial court found the following:

> Dr. Gregory Marchewka, a board certified cardiologist, testified on behalf of Dr. Osowski primarily on two issues - whether a cardiologist should have been consulted before surgery was performed on [Decedent] and the cause of [Decedent's] death. In his direct testimony, Dr. Marchewka reviewed every preoperative test that [Decedent] had undertaken, the type of surgery that was to be performed, and [Decedent's] overall medical history and his lifestyle and daily living and opined that each of the particular results of the tests, the type of surgery, his past medical history and his lifestyle, including cigarette smoking, being overweight and a brother having heart disease, did not warrant sending [Decedent] to a preoperative cardiac consultation. Dr. Marchewka's testimony disputed that offered by [Quivers'] expert, Dr. Brian White. Dr. Marchewka also testified that, based on the autopsy's revelation that [Decedent] had severe artery disease, which the doctor found to be asymptomatic, [Decedent] died of a cardiac arrest, although he also concluded he was not really sure why he died.

> Dr. Louis J. Wickas, III, a cardiac anesthesiologist, also testified on behalf of Dr. Osowski. He opined that there was no need for a preoperative referral to a pulmonologist. His testimony focused primarily on the intraoperative care provided by Dr. Osowski and opined that Dr. Osowski's monitoring and anesthetic treatment was within the standard of care. He testified that Dr. Osowski properly reacted to the changes in the surgery from lap[a]roscopic to open surgery, requiring significant modifications in narcotic administration. Dr. Wickas examined the treatment in recovery and the extubation of [Decedent] and opined that the extubation was appropriate and timely. He also testified that the

code efforts of Dr. Osowski after [Decedent] went into cardiac arrest were within the standard of care.

[Quivers] asserts that all of Dr. Caldwell's testimony was duplicative of these witnesses and he should have been precluded from testifying. The Court will first note that the Court did grant the motion in part. Dr. Caldwell submitted a late supplemental report and upon [Quivers'] motion, the Court precluded Dr. Caldwell's testimony on any matters in the June 7 report commenting on Dr. Yodice.

An analysis of the testimony of Dr. John Caldwell, an anesthesiologist, exposes some duplication in the testimony of that offered by another party through Dr. Marchewka and Dr. Wickas. The Court notes that counsel for the hospital indicated that he would "do everything in (his) power to make sure Dr. Caldwell's testimony is not a duplication of anything else we've heard." He testified briefly as to the preoperative care given by Dr. Osowski to avoid duplication. He testified at length about the extubation process done by the nurse anesthetist (CRNA) Nick Francia and overseen by Dr. Osowski. He focused on the respiratory symptoms and oxygen levels experienced by [Decedent] postoperatively. The respiratory changes were discussed only minimally by Dr. Marchewka. Dr. Wickas testified as to the respiratory condition as to the extubation process only.

The Court may exclude relevant evidence if it is needlessly cumulative or duplicative. Pennsylvania Rules of Evidence, Rule 403. The Pennsylvania Superior Court defined cumulative evidence as "additional evidence of the same character as existing evidence and that supports a fact established by the existing evidence." Commonwealth v. Flamers, 53 A.3d 82, 91 (2012 Pa. Super. 186) Footnote 6 quoting Black's Law Dictionary, Seventh Edition. In this case, some of Dr. Caldwell's testimony was cumulative, some was not. It was offered by a different party, although Defendant Hospital had the same interest as Defendant Osowski. The Court limited the testimony of Dr. Caldwell, striking all testimony contained in his amended report and directing counsel to avoid duplicative testimony. Overall, the Court found that Dr. Caldwell's testimony was not needlessly duplicative.

Trial Court Opinion, 9/28/2018, at 7-9 (record citations omitted).

We agree with the court's conclusion for several reasons. First, other than general statements,[5] Quivers does not cite what specific testimony of Dr. Caldwell was duplicative to the opinions provided by Dr. Marhefka and Dr. Wickas. Moreover, Quivers presents a muddled argument, in which she states all three defense experts' reports and testimony (as in Drs. Marhefka, Wickas, and Caldwell) were identical, but she does not allege that the testimony of Dr. Marhefka and Dr. Wickas was duplicative of one another, only with respect to Dr. Caldwell.

Second, a review of Dr. Caldwell's testimony primarily concerned a theory pursued by Quivers regarding extubation, which fell under the care provided by Mon Valley Hospital's Certified Registered Nurse Anesthetist ("CRNA") Nick Francia in addition to Dr. Osowski. By way of background, Brian White, M.D., an anesthesiologist expert witness for Quivers, testified CRNA Francia prematurely extubated the Decedent as he was "not hemodynamically stable." N.T., 6/15/2018, at 461; see also id. at 458-471,

_____

[5] Specifically, she only states:

> Drs. Marhefka, Wickas, and Caldwell offered opinions both in their pre-trial reports and in their trial testimony that were virtually identical to each other: that Dr. Osowski's preoperative evaluation of [Decedent] was appropriate, that Dr. Osowski's intraoperative and postoperative care of [Decedent] met the standard of care, and that [Decedent] died of causes unrelated to Dr. Osowski's anesthesia care.

Quivers' Brief at 39.

509-511, 526-536 (Dr. White's extubation testimony on direct and cross-examinations). In response to Dr. White's testimony, Mon Valley Hospital rebutted with the testimony of Dr. Caldwell. Initially, Dr. Caldwell was asked his anesthesiology background with respect to Decedent's preoperative assessment and care during surgery without objection from Quivers' counsel. See N.T., 6/21/2017, at 1303-1314. Dr. Caldwell then testified extensively about the extubation process, completed by CRNA Francia and overseen by Dr. Osowski. The following is a portion of his testimony:

Q[:] Doctor, let's move to the extubation process because it's been criticized and it was testified about yesterday, and I want to take you to that. As an anesthesiologist, are you familiar with extubation?

A[:] Yes.

Q[:] Is that something that the anesthesiologist and CRNA do?

A[:] It is.

Q[:] It has been suggested by Dr. White, I believe, that because this patient was extubated within minutes of the completion of the surgery that that was malpractice or that fell below the standard of care. First of all, do you agree with that conclusion, within minutes?

A[:] Do I believe that the patient was extubated within minutes of the conclusion of surgery?

Q[:] No. I apologize if the question was asked wrong. My question is, do you believe that extubating a patient, quote, "within minutes" is in and of itself falling below the standard of care?

A[:] I understand. No, it is not.

Q[:] Why not?

- 12 -

A[:]  We don't judge a patient's fitness to breathe appropriately on their own and to maintain an adequate airway based upon the clock.  It is based upon their physiologic condition at the time.  Patient might be hours after care and not be an appropriate candidate for extubation.  Patient may be only moments after the completion of surgery and be appropriate for extubation.

It's based upon many factors that ultimately dictate whether a patient is going to be able to maintain that A and B, airway and appropriate breathing before the patient is extubated.

Q[:]  Can you tell the jury what should be looked for, what are the steps that take you to the conclusion that a patient can be extubated?

A[:]  Well, the patient needs to have emerged from anesthesia and met various milestones in terms of demonstrating consciousness and ability to follow commands, but more importantly, the patient needs to have returned to spontaneous ventilation and they need to have returned to that breathing on their own – that's what we mean by spontaneous respiration – with adequate what we call respiratory mechanics, that is, that the volume of gas being exchanged with each breath is sufficient.

What does it need to be sufficient for?  It needs to be sufficient for the two and only two jobs the lungs have, which are to eliminate $CO_2$ and, more importantly, to entrain oxygen from the outside gases and deliver that oxygen to the body.

So the patient needs to have emerged from anesthesia with adequate respiratory mechanics, indicating that they are eliminating $CO_2$ appropriately and, more importantly, that they are exchanging oxygen appropriately, and the clinical judgment is that even with the breathing tube removed that those conditions will persist.

...

Q[:]  Doctor, after the patient is extubated, so we've gone through this process of assessing whether he can breathe on his own, whether he's getting oxygen and whether he's expelling $CO_2$ and decision was made to extubate, which we know is done, what is

- 13 -

the responsibility of the CRNA or anesthesiologist at that point relative to the patient's breathing?

A[:]  It is to test -- the clinician's obligation is that in believing that it is safe to extubate a patient, the clinician is obligated to always examine the patient for evidence that their impression and their decision to extubate was wrong.  If the patient wasn't flying, if the patient wasn't tolerating.

So the patient -- the clinician's obligation is to monitor the patient for the A and B, right, in particular with an emphasis on continued oxygenation and patency of the airway.  That is their primary obligation regarding what is done after extubation.

Q[:]  Just recapping, we've made a decision that the patient can breathe, pulled out the tube, continue to monitor the patient in order to make sure he can continue to breathe.  Is that what you're saying?

A[:]  Right.

Q[:]  And based upon the record, does it appear that [Decedent] could continue to breathe?

A[:] That's right.

Q[:]  Did he have spontaneous respiration?

A[:]  He did.

Q[:]  Did he have adequate oxygen saturation?

A[:]  He did.

Q[:]  Was he expelling $CO_2$?

A[:]  He was.

...

Q[:]  There is a rise in his blood pressure that has been discussed.  Is that a response to -- or let's put it this way.  Is that a negative response to removing the breathing tube that would cause you,

the anesthesiologist, to want to put the breathing tube back in? Do you follow my question?

A[:] Let me repeat it and see if I have it. Is the rise of blood pressure that's seen during the anesthetic emergence an indication that the breathing tube had to be put back in?

Q[:] That's it, much better stated.

A[:] Not unless the patient was hypoxic.

Q[:] Hypoxia is what?

A[:] Low oxygen. So if the patient were hypoxic, if the patient had a low oxygen level, no matter what the blood pressure was, the patient would have required reintubation.

Q[:] Was this patient hypoxic?

A[:] No.

Q[:] Is that rise in blood pressure something that you would expect to see upon emergence from anesthetic?

A[:] Yes. We call it emergent hypertension.

Q[:] It has been suggested that it would be a very simple solution for [Decedent] to leave him intubated for some period of time after he leaves the operating room. Is that something that you believe should have been done for [Decedent]?

A[:] Should he have been permitted to remain intubated?

Q[:] That's the first question.

A[:] No.

Q[:] Why not?

A[:] Because he met extubation criteria, and following extubation he continued to demonstrate that he continued to meet extubation criteria. You would not reintubate for social reasons.

Id. at 1314-1316, 1319-1321, and 1322-1323.[6]

Dr. Marchewka and Dr. Wickas were both questioned briefly about the timeliness of Decedent's extubation procedure, but it was not the focus of their

_____

[6] Furthermore, in his September 9, 2016, expert report, Dr. Caldwell opined:

> [Quivers] contends that [Decedent's] bradycardia and arrest were of respiratory origin.
>
> ...
>
> [Quivers] asserts that wheezing recorded by PACU nurse [Yvonne] Daniels at [Decedent's] arrival, when coupled with XRAY findings of atelectasis and possible left lower lobar collapse constituted, in and of themselves, respiratory distress. A further contention is that these findings were, by virtue of their existence, indications for emergent reintubation. Reintubation would certainly have been needed, even without findings of wheezing or XRAY abnormalities, had [Decedent] been in hypoxic respiratory distress, had severe airway obstruction, or been unresponsive from $CO_2$ retention. But [Decedent] lacked clinical manifestations of respiratory distress in any form; both in terms of symptoms of distress, or the physiologic deteriorations in gas exchange that distress would have caused were distress present. Wheezing in the PACU is commonly heard after anesthesia on stethoscope exam, more often in smokers. Chest films very commonly display atelectasis after the sort of surgery [Decedent] had undergone. More important than audible wheezing or lung field findings is, however, their physiologic significance. For Dr. Osowski to have reintubated [Decedent], simply on the basis of wheezing and atelectasis, in absence of objective signs of respiratory failure, would have been irregular.

Complaint in Civil Action, 7/29/2014, at Exhibit A, Dr. Caldwell's September 9, 2016, Expert Report at 4.

testimony.[7]  See N.T., 6/19/2017, at 835-839 (Dr. Marchewka's testimony)

and N.T., 6/21/2017, at 1278-1279 (Dr. Wickas' testimony).[8]  In denying the

motion for a mistrial, the court opined:

> I know I felt it's gone beyond what [Quivers' counsel] had said in terms of some repetitive nature certainly in the beginning of his testimony, but it wasn't even objected to at that time, but I understand you're reluctance to do that at the time, but the intubation or extubation, I guess, is something that was done by the hospital.  So I do think that has some merit.

N.T., 6/21/2017, at 1351.

Accordingly, while there may have been some overlapping of topics with

respect to the three experts,

_____

[7]  As noted by the trial court, Dr. Machewka's testimony primarily concerned two issues – whether a cardiologist should have been consulted before the surgery was performed and Decedent's cause of death.  See Trial Court Opinion, 9/28/2018, at 7.  Likewise, Dr. Wickas' testimony focused on the intraoperative care provided by Dr. Osowski.  Id.

[8]  For instance, Dr. Wickas' testimony on extubation was as follows:

> Q[:]  In your opinion, do you have an opinion within a reasonable degree of medical certainty that the clinical criteria for extubation were met and that the extubation was appropriate and in accordance with the standard of care?
>
> A[:]  Yes, I do.
>
> Q[:]  What is that opinion?
>
> A[:]  I believe the extubation was appropriate and timely in all respects, and there was no reason to leave that [Decedent] intubated.

N.T., 6/21/2017, at 1278-1279.

[w]e cannot conclude that a new trial is warranted merely because each expert witness touched briefly upon the subject matter that was thoroughly covered by the other expert witness. The slightly cumulative nature of the intersecting testimony was not so harmful that the result at trial would have been different had the testimony been restricted, and a new trial is not required.

Whitaker, 984 A.2d at 522-23 (citation omitted). Indeed, a review of the record confirms the court's conclusion that the probative value of Dr. Caldwell's testimony was outweighed by a danger of needlessly cumulative evidence with respect to Dr. Marchewka and Dr. Wickas; therefore, Quivers was not prejudiced by the presentation of his expert testimony. See Pa.R.E. 403.

Third, as will be discussed in detail below, although we recognize Mon Valley Hospital's liability was partially derivative of Dr. Osowski as an ostensible agent, it had its own individual right to defend as to CRNA Francia's (a hospital employee) actions regarding the extubation procedure. Mon Valley Hospital and Dr. Osowski were separate parties with separate counsel, and they should be permitted to choose their own experts.[9] See Myers v. Genis, 344 A.2d 691, 695 (Pa. Super. 1975) ("[A] defendant at trial has the right to call his own medical experts to testify as to their opinion of the extent of the injuries at issue. The importance and effect of [this valuable right] cannot be discounted."). Therefore, no relief is warranted, and our review of the record

_____

[9] Dr. Caldwell was Mon Valley Hospital's sole expert witness.

reveals no basis upon which to disagree with the trial court's decision to admit Dr. Caldwell's expert testimony.

Lastly, with respect to Quivers' argument that the court abused its discretion by declining to provide any curative or limiting instruction to the jury regarding Dr. Caldwell's repetitive testimony, we find no merit to this claim based on our above-stated analysis. Because Dr. Caldwell's testimony was not needlessly repetitive, as we determined above, the court did not abuse its discretion or commit an error of law in declining to provide a "repetitive testimony" instruction. Accordingly, we conclude Quivers' first and second claims fail because the trial court did not err in failing to grant her motion in limine to exclude Dr. Caldwell's testimony, her motion for a mistrial at the conclusion of his direct testimony, and by declining to provide a curative instruction regarding his testimony.

In Quivers' third claim, she argues Mon Valley Hospital should not have been permitted to offer expert testimony and a defense argument because there were no direct claims of negligence against it at trial. See Quivers' Brief at 48. Quivers points to the following: (1) in the complaint, she made claims of both negligence and corporate negligence against Mon Valley Hospital "based upon its care of [Decedent] and of its hiring, supervision, and/or credentialing of Dr. Manzetti and Dr. Lementowski;"[10] (2) prior to trial, the

---

[10] Quivers' Brief at 48.

court granted a motion in limine to preclude evidence of Dr. Manzetti's prior legal matters and consequently, the allegations of corporate negligence against Mon Valley Hospital were effectively dismissed and "the hospital could only possibly have been found liable by the jury as the principal of its ostensible agent[,] Dr. Osowski;"[11] and (3) because Quivers was precluded from introducing evidence to support the corporate negligence claim, the court granted a nonsuit as to those claims four days prior to trial. Id. at 48-49. Quivers relies on Deeds v. Univ. of Pa. Med Ctr., 110 A.3d 1009 (Pa. Super. 2015), appeal dismissed, 128 A.3d 764 (Pa. 2015), to support her contention. Furthermore, she argues the court erred by not limiting Dr. Osowski's and Mon Valley Hospital's representation to one attorney pursuant to Pennsylvania Rule of Civil Procedure 223.[12] Quivers' Brief at 53. Quivers states: "Here,

_____

[11] Id. at 48-49.

[12] Rule 223 provides, in relevant part:

> Subject to the requirements of due process of law and of the constitutional rights of the parties, the court may make and enforce rules and orders covering any of the following matters, inter alia:
>
> ...
>
> (2) Limiting the number of attorneys representing the same party or the same group of parties, who may actively participate in the trial of the case or may examine or cross-examine a witness or witnesses[.]

Pa.R.C.P. 223.

not only judicial economy but principles of fairness to [Quivers] should have prevented Mon Valley Hospital from having counsel actively participate in trial once the corporate negligence claims against it were dismissed." Id. at 54.

In Deeds, supra, the plaintiff filed a medical malpractice suit against the hospital and the trustees of the university associated with that hospital, alleging the defendants negligently failed to diagnose the plaintiff with preeclampsia prior to giving birth to a child with severe birth defects. Deeds, 110 A.3d at 1011. At the end of the first day of trial, the plaintiff informed the court that the parties had stipulated that "'all the people who provided medical treatment to [the plaintiff] were agents of [Defendant Hospital and] asked the [c]ourt to dismiss the other defendants from the case.'" Id. (citation omitted). However, the court denied the motion to dismiss the other defendants, "thus permitting both [the hospital] and the [t]rustees to be represented separately by individual counsel, each of whom then presented separate arguments and conducted separate examinations of witnesses throughout trial. Only [the hospital], and not the [t]rustees, appeared on the verdict sheet." Id. On appeal, the plaintiff argued the trial court erred in permitting separate counsel for each defendant "to examine witnesses and present arguments individually to the jury, despite the fact that the [t]rustees were not an active party in the litigation and despite the fact that the [t]rustees did not appear on the verdict sheet." Id. at 1014.

A panel of this Court noted:

the facts and claims pleaded against [the hospital] and the [t]rustees were identical. Moreover, [the hospital] and the [t]rustees had asserted no cross-claims against one another. [The hospital] and the [t]rustees shared expert witnesses as well. They were members of "the same group of parties," and the matter of coverage alone did not require counsel for the [t]rustees' active participation.

Id. at 1016 (citations omitted). The panel then concluded the plaintiff was prejudiced because "counsel for the [t]rustees transgressed the collateral source rule on at least three occasions, transgressions which form[ed] the basis for the award of a new trial in th[e] case." Id. at 1017. Specifically, "the [t]rustees' questions, which involved improper inquiries into [the plaintiffs'] existing financial coverage for her medical needs, went well beyond the scope of [the plaintiff's] allegations of negligence against [the defendant doctor]." Id. The panel then held the trial court "abused its discretion by permitting counsel for the [t]rustees and counsel for [the hospital] effectively to 'tag team' [the plaintiff] at trial while representing the same interest." Id.

Turning to the present matter, the trial court opined:

[Quivers] argues that Defendant Mon Valley Hospital should have been precluded from offering any testimony on its behalf because the only claim against it at the time was vicarious liability for its ostensible agent Dr. Osowski. The corporate negligence claim made against Defendant Hospital was dismissed. The Hospital stipulated as to its vicarious liability so the Hospital was not on the Verdict and Interrogatories to the Jury.

[Quivers] cites the Deeds case in her Statement of Matters Complained of on Appeal. Deeds can be distinguished from this case in several ways. In Deeds, from the first day of trial, the [p]laintiff removed all claims of corporate negligence against UPMC. In this Quivers case, the corporate negligence claim was not finally ruled upon until after Defendant Manzetti

- 22 -

testified. [Quivers] asserted that the corporate negligence claim could be revived on cross-examination of Dr. Manzetti. His testimony was offered on day seven of a ten day trial. [Quivers] asked the Court to reconsider that motion on corporate negligence on day eight after the testimony of Dr. Manzetti was completed. Additionally, Dr. Caldwell testified as to the acts performed by the staff postoperatively from the extubation performed by anesthetist Francia and by life-saving attempts by the hospital staff. The Defendants' counsel presented their cases in concert with each other and [Mon Valley] Hospital had a clear interest in seeking to elicit testimony supporting the actions taken by Dr. Osowski and the employees of [Mon Valley] Hospital. The Court recognizes that barring testimony from the Hospital could be supported as well, and in reflection, might have been prudent. The decision was within the Court's discretion. The Court notes that Dr. Osowski could have offered Dr. Caldwell for testimony on areas not duplicated. Any error was therefore harmless.

Trial Court Opinion, 9/28/2018, at 9-10 (emphasis added).

We agree with the trial court's conclusion and affirm on its sound rationale. As explained by the court, Deeds is distinguishable from the present matter, and therefore, we do not find it controlling here. Most notably, in Deeds, the defendants were considered the same defendant whereas here, Mon Valley Hospital was a named and distinct defendant with interests not substantially similar to the other defendants. Furthermore, as counsel for Mon Valley Hospital pointed out at trial: (1) Mon Valley Hospital has a separate risk than Dr. Osowski, where, if the doctor is found liable, the hospital has a responsibility for a certain element of the damages if it goes over; and (2) counsel for the hospital limited his questioning to cross-examination of plaintiff expert, Dr. White, on the issue of extubation as it related to the actions of CRNA Francia and the direct examination of its witnesses, CRNA Francia and

Dr. Caldwell.  See N.T., 6/22/2017, at 1410-1414.  Lastly, we reiterate the notion that a defendant has a right to call his own medical expert witness to testify regarding their opinion of the injuries at issue.  See Myers, supra.

With respect to her Rule 223 argument, we note counsel for Quivers did not object to the participation of counsel for Mon Valley Hospital in the case until the morning of the ninth day of a 10-day trial, at which time the trial testimony had concluded and the parties were preparing for closing arguments.  See N.T., 6/22/2017, at 1408.  Therefore, we also find Quivers has waived this argument.  See Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). As such, we conclude the court did not err in permitting Mon Valley Hospital to offer expert testimony and a defense argument and by declining to limit Dr. Osowski's and Mon Valley Hospital's representation to one attorney pursuant to Pennsylvania Rule of Civil Procedure 223.  Accordingly, Quivers' third argument has no merit.

Lastly, Quivers asserts:

[The trial court] erred when it excluded evidence regarding intraoperative blood pressures and heart rates [that Quivers'] expert Paul Yodice, M.D. gave on direct examination, then permitted Dr. Yodice to be cross-examined regarding that testimony, and then overruled [Quivers'] motion to play the portions of Dr. Yodice's direct examination testimony that discussed intraoperative blood pressures and heart rates after the cross-examination had been played for the jury.  The court below's ruling resulted in significant confusion to the jury, as it only heard Dr. Yodice's testimony regarding the intraoperative fluctuations in heart rate and blood pressure on cross-examination without

having those matters explicated by Dr. Yodice on direct examination.

...

Dr. Yodice's testimony regarding the intraoperative vital signs was a crucial element of his opinion that [Decedent] died of postoperative cardiopulmonary collapse brought on, in part, by the stress of surgery. [Defendants], collectively, called seven expert witnesses on their behalf, all of whom testified as to [Decedent's] cause of death, while [Quivers] were limited by the court's ruling to presenting two expert witnesses regarding [Decedent's] cause of death. Furthermore, the effect of the court's ruling was to render Dr. Yodice's opinion regarding the cause [Decedent's] death unintelligible to the jury, and to prevent [Quivers] from fully presenting their case in chief to the jury. The court's ruling also was unfair to [Quivers], as the jury was permitted to hear evidence favorable to [Defendants] from seven expert witnesses; namely, that [Decedent's] death was not caused by the surgery, but not evidence favorable to [Quivers]; namely, that the surgery caused his death.

Quivers' Brief at 55-57.

By way of background, prior to trial, Quivers recorded a videotaped deposition of her expert witness, Dr. Yodice, a critical care physician.[13]

_____

[13] Dr. Yodice described critical care medicine as follows:

[T]he evaluation of patients for their level of illness to decide how sick they are or may become, to anticipate interventions to prevent them from becoming sicker or to take care of those who are already quite ill or critically ill in the hopes of recovery and return back to normal life. So essentially [a] critical care physician does evaluations to prevent deterioration or worsening of conditions and to treat patients once something -- some untoward event has occurred.

Transcript of Paul C. Yodice, M.D., 6/7/2017, at 6-7.

Defendants filed objections to the opinion testimony being offered by Dr. Yodice concerning Dr. Osowski's intraoperative management care of Decedent, alleging the doctor was not qualified to give an expert opinion on intraoperative anesthesia management and his deposition testimony exceeded the scope of his report.[14] At trial, the court heard argument on the matter and excluded Dr. Yodice's videotaped direct examination deposition testimony concerning intraoperative anesthesia management. See N.T., 6/14/2017, at 260-296. The portions of his deposition testimony, on direct and at issue, were redacted when shown to the jury. Id. After the court's ruling, the following discussion took place:

> [Counsel for Dr. Osowski]: Counsel [for Quivers], did you have based upon the Court's rulings cross-designations on the cross-examination that we need to talk about?
>
> [Counsel for Quivers]: Cross-designations?
>
> [Counsel for Dr. Osowski]: Yes. If there are rulings here, are you seeking to have any of the cross --
>
> [Counsel for Quivers]: No.

Id. at 295-296. Subsequently, and in accordance with the court's rulings, Dr. Yodice's videotaped cross-examination by Defendants and Quivers' redirect examination deposition testimony were shown to the jury.

_____

[14] See Memorandum of Law in Opposition to Defendant Thad Osowski, M.D.'s Motion in Limine to Preclude Expert Testimony from Paul Yodice, M.D., 5/31/2017.

Keeping our standard of review regarding the admissibility of evidence in mind, we note the trial court found the following:

[Quivers] asserts that the Court erred when it limited the direct testimony of her expert, Dr. Paul Yodice. The Court ruled that Dr. Yodice was not qualified to opine on intraoperative care. The Defendants sought to strike Dr. Yodice's testimony in its entirety. Dr. Paul Yodice was a physician board certified in neurocritical care. He was also certified in internal medicine. As explained by Dr. Yodice, critical care doctors and physicians, or intensivists, are physicians who specialize in evaluating patients prior to surgery to assess risk and to manage postoperative care. Dr. Yodice testified that his opinions would focus on Dr. Osowski. He offered explanations on anesthesia care, that anesthesiologists perform many of the same functions as a critical care physician preoperatively and in postoperative management. He further stated that an anesthesiologist provides anesthesia and medication treatment during the operation which he does not do in his specialty. He never managed a patient under anesthesia in the OR. Based on that testimony, the Court found that he could not opine on intraoperative care as he had no qualifications to do so.

In the Statement of Matters Complained of on Appeal, in addition to complaining that the testimony should not have been limited, [Quivers] also claims that on cross-examination, testimony was played and not redacted concerning intraoperative care and, therefore, the earlier redacted testimony should have been presented to the jury. Apparently, when going through what testimony to redact, counsel of Dr. Lementowski and [Mon Valley H]ospital focused on the witness's direct testimony and not the cross-examination and no redactions in cross-examinations were made. The cross-examination testimony complained of by [Quivers] was postoperative, however, and was clearly within the expertise of a critical care specialist. The Court also notes that [counsel for Quivers] was able to question him further on the issue in her redirect testimony. No error was made.

Trial Court Opinion, 9/28/2018, at 10-11 (record citations omitted).

Again, we agree with the trial court's determination and affirm on the basis of the court's opinion, but mention several additional comments. First,

it merits emphasis that Quivers does not challenge the court's finding that Dr. Yodice was not qualified to opine on intraoperative care,[15] only that the redaction of his direct testimony created confusion. As such, Quivers is bound by that determination. Second, to the extent Quivers argues the court erred in permitting Dr. Yodice to be cross-examined regarding testimony at issue, and then overruled her motion to play the portions of Dr. Yodice's direct examination testimony that discussed intraoperative blood pressures and heart rates after the cross-examination had been played for the jury, we find this issue waived for failure to raise with the trial court. See Pa.R.A.P. 302(a). As noted above, counsel for Dr. Osowski provided counsel for Quivers with the opportunity to cross-designate any portion of the doctor's cross-examination that she found questionable and she declined to do so. See N.T., 6/14/2017, at 295-296. Moreover, a review of the transcripts does not reveal that Quivers requested the court play portions of Dr. Yodice's direct examination testimony after the cross-examination had been played for the jury. See id. at 391-

_____

[15] See Medical Care Availability and Reduction of Error Act ("MCARE"), 40 P.S. §§ 1303.101-1303.910; Vicari v. Spiegel, 989 A.2d 1277, 1280 (Pa. 2010) ("With passage of the MCARE Act, the General Assembly created a more stringent standard for admissibility of medical expert testimony in a medical malpractice action by the imposition of specific additional requirements not present in the common law standard."); Anderson v. McAfoos, 57 A.3d 1141 (Pa. 2012) (all three 40 P.S. § 1303.512(c) requirements – (1) familiarity with standard of care, (2) same subspecialty, and (3) same board certification – are mandatory in order for an expert witness to testify on a medical matter in a medical malpractice action against a defendant physician).

393.[16]  Notably, Quivers does not cite to the part in record where she made the motion.[17]  See Quivers' Brief at 55.  Lastly, with respect to her "number of witnesses" contention, the trial court did instruct the jury not to only consider the number of witnesses each side presents, but rather "the quality of the testimony of each witness."  N.T., 6/23/2017, at 1523.  See Maya v. Johnson & Johnson, 97 A.3d 1203, 1222 (Pa. Super. 2014) ("The law presumes that the jury will follow the instructions of the court."), appeal denied, 112 A.3d 653 (Pa. 2015).  Accordingly, Quivers' final claim fails.

Judgment affirmed.

Judge Musmanno joins the memorandum.

Judge Kunselman files a concurring memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/27/2019

_____

[16]  Our review of the trial transcript reveals an objection made by counsel for Dr. Osowski regarding a portion of Dr. Yodice's deposition but there was no comment by counsel for Quivers.  See N.T., 6/14/2017, at 391-392.

[17]  See Pa.R.A.P. 2119(c); see also B.G. Balmer & Co. v. Frank Crystal & Co., 148 A.3d 454, 468 (Pa. Super. 2016) (stating that this Court "will not scour the record in order to find support for statements made by litigants in their briefs.").